PHŒNIX ASSURANCE COMPANY OF LONDON, LIMITED,
v. BOYETTE.

Opinion delivered November 4, 1905.

1. REFORMATION OF INSTRUMENT—INSURANCE POLICY.—A fire insurance policy may, either before or after loss, be reformed so as to conform to the real agreement of the parties. (Page 48.)

2. SAME—WHEN POLICY REFORMED.—Where a policy of fire insurance was accepted by the insured upon the representation of the insurer's agent that it covered certain property agreed to be insured, a court of equity will reform it if it is not in accordance with the agreement. (Page 48.)

3. INSURANCE—POWERS OF GENERAL AGENT.—An agent with general authority to issue policies of fire insurance has authority to issue a policy on part of the cotton situated in a certain warehouse. (Page 51.)

4. SAME—WAIVER OF PROOF OF LOSS.—Defects in the proof of loss of the insured property are waived by denial of liability and refusal to pay, based on other grounds. (Page 51.)

Appeal from Hempstead Chancery Court; JAMES D. SHAVER, Chancellor; affirmed.

STATEMENT BY THE COURT.

The plaintiff, R. A. Boyette, has for many years been engaged in the business of keeping a warehouse at Hope, Ark., for the purpose of storing cotton for farmers, merchants, and cotton buyers. The cotton therein was usually kept insured against fire. Generally, the owners of large quantities of the cotton carried insurance policies in their own names, and the plaintiff carried policies for the benefit of his customers, usually farmers who had only a few bales of cotton at a time in the warehouse. A custom is shown to have prevailed at that place for many years past for cotton warehousemen to carry policies of insurance intended to cover the cotton of customers who carried no insurance in their own names, but wanted their cotton insured, and to make a charge therefor per bale sufficient to cover the cost of the insurance. The practice was to write upon the warehouse tickets of customers desiring to participate in such insurance the word "Insured," signed by the warehouseman, thus indicating that the cotton represented by the ticket was insured under a policy carried by the warehouseman.

On November 1, 1901, the Phoenix Assurance Company, of London, through its local agent at Hope, issued and delivered

to plaintiff a standard form policy of insurance with a slip in the following form attached thereto descriptive of the property insured: "$2,000. On cotton in bales, owned or held by the assured, or on commission, or sold but not delivered, while contained in the one-story brick, metal-roof building and on the cotton yards thereto belonging, situated on the north half of block 30 and west half of block 31, Hope, Ark." The slip contained the further provisions as follows: "And it is further agreed and understood that if at the time of the fire the whole amount of insurance on the property covered by this policy shall be less than the actual cash market value thereof, this company shall, in case of loss or damage, be liable for such proportion only of the whole loss or damage as the amount insured thereby shall bear to the actual cash market value of such property at the time and place of fire. And the assured under this policy hereby covenants and agrees to keep a set of books showing the complete daily record of the date at which each bale of cotton covered under this policy has been purchased, from whom purchased, in what compress, warehouse or yard stored, together with the original tag number or mark thereon, with its weight and classification, and a complete daily record of all shipments or sales, showing to whom shipped or sold, with date of shipment, from what warehouse, compress or yard so shipped, and the original tag number or marks, weight and classification of each bale, and in case of loss the assured agrees and convenants to produce such books and records; and in the event of failure to produce the same, this policy shall be deemed null and void, and no suit or action at law shall be maintained thereon for such loss."

At the time of the issuance of said policy, and during its life, plaintiff made indorsements upon warehouse tickets in accordance with the custom before stated, indicating that the cotton represented thereby was insured under the policies then carried by him, and at the time of the fire, on December 29, 1901, he had in his warehouse 122 bales of cotton represented by the tickets bearing the above mentioned indorsement in the hands of his customers. He also had on hand in his warehouse other cotton, most of which was owned in large quantities by customers who carried insurance thereon in their own names. At the time

of the fire the total number of bales held by him on storage in the warehouse aggregated 795 bales, and the fire destroyed 110 of the 122 bales owned by customers holding the indorsed tickets, of the actual cash value of $4,480.

Plaintiff had $3,000 concurrent insurance under a similar policy in another company, making total insurance $5,000.

Appellant's adjuster, in attempting to settle with appellee, claimed that the policy covered all of the 795 bales of cotton in the warehouse, and that, under the terms of the policy hereinbefore quoted, the company was liable only for such proportion of the loss as the amount of the policy bears to the cash value of the 795 bales, and he offered to pay only $300 as such proportion of the loss. Appellee claimed that the policy covered only the 122 bales represented by the indorsed tickets, and that the proportion of the loss chargeable under this policy was $1,790. Proof of loss was furnished by appellee, and, upon refusal by the company to pay more than $300, this suit was instituted.

This is a suit in equity to reform the policy. It is alleged in the complaint that in the recitals of the policy a mutual mistake was made in describing the property insured, and that, according to the real contract entered into between the parties, said policy was intended to cover only such cotton in the warehouse as appellee should receive from and insure for his customers leaving cotton with him, and for which he had issued tickets as aforesaid.

Appellant in its answer denied that any mistake was made in writing the policy, or that there was any contract or agreement other than expressed in the policy, and alleged that no proof of loss had ever been furnished by appellee so as to comply with the terms of the policy when reformed as asked by appellee. It is also alleged in the answer that the "iron safe clause" in the policy would be inapplicable and inappropriate to a policy when reformed as asked by appellee, and appellant made its said answer a cross-complaint, praying that if the court should reform the policy in the particular asked by appellee, the "iron safe clause" be also reformed so as to require the assured to keep a set of books showing a daily record of receipts and disposition, etc., of the cotton "insured by the insured."

· · C. A. Bridewell, appellant's local agent at Hope, testified that he had insured appellee's cotton under these forms for several years, but that this policy was the first in appellant company. His statements concerning the transactions were as follows:

"Mr. Boyette, when I first wrote this insurance for him, explained to me that it was to cover the farmers' cotton, who stored with him, and who required or requested him to have the same insured. I examined the method at which he fixed that insurance by looking at one of his tickets; and since that time, whenever he wanted insurance, he would just tell me to write him $2,000 or $3,000, or $10,000, or whatever amount of insurance was necessary to cover cotton that was insured under these marked tickets.

Q. "What cotton was that?"

A. "Cotton that belonged to farmers, unsold, that was stored in the warehouse and insured by their instructions."

Q. "What was his method in regard to that insurance? How did the farmer obtain his insurance?"

A. "The printed ticket that is issued to every farmer, Mr. Boyette would mark across the ticket in red ink, I think, "Insured," and sign his name to it. His name was printed to the ticket, but he would write diagonally across the ticket 'Insured' and sign his name to it."

A. "I wrote that policy to cover the cotton belonging to the farmers that was stored in Boyette's warehouse and upon his yards which was insured by request of the farmers, by the fact of the marks upon their ticket by Mr. Boyette."

· He further testified that it had been the custom in Hope for many years to issue this form of policies to warehousemen to cover cotton held by them for farmers on storage, and to whom they had issued these tickets, showing that the cotton had been insured.

Appellant's testimony on this subject was, in part, as follows:

"The object of our taking insurance was that Mr. Knighten and Capt. Bridewell refused to write insurance for one, two or three bales on account of it being such small amount. It was through their suggestion that I took this insurance."

Q. "What was your mode and manner of securing insurance for customers' cotton stored with you?"

A. "I took out the policy for the purpose of covering the cotton. This policy was taken with the understanding that it covered just such cotton as the farmers requested to be insured. We went ahead, whenever a farmer came in with a bale of cotton and requested that cotton to be insured, we marked the ticket 'Insured' for a given length of time and for a given price, and the insurances charges upon it."

Q. "When you went to Bridewell, state exactly what you said to him, what you told him you wanted, and what was done?"

A. "I would meet him, and tell him I wanted so many dollars of insurance to cover just such cotton as I spoke of just now wherever a party wanted it insured, and we marked the ticket 'Insured.' I simply went to him, and told him I wanted that kind of insurance, and asked him to fix up the policy, and he did so."

Q. "Was this policy to cover customer's cotton made at the suggestion of Major Bridewell.

A. "Yes. It was issued according to those two agents. I used to have my insurance with Knighten, and did for several years, but changed and divided it with Bridewell, and this policy was taken under their instructions, as being the best plan to insure cotton, from the fact that they could not or would not insure one or two bales at a time."

The chancellor rendered a decree, reforming the policy in accordance with the prayer of the complaint, and in favor of the plaintiff for the recovery of the sum of $1,792 and interest.

The defendant appealed.

*W. L. Terry,* for appellant.

The agent made out and delivered the instrument intended, and the plaintiff accepted it without objection to its statement and description of the risk and subject-matter and his interest therein. If there was a mistake, it was a mistake of *law,* and not a mutual mistake of *fact.* Ostrander on Ins. 109. If the agent had told the plaintiff that the policy would cover only the specific cotton which plaintiff desired to cover, that was a conclusion of law on his part, and not binding on the company. 31 N. E. Rep. 851; 72 Ind. 143; 71 Fed. 476; 58 Ark. 281; 60 Fed. 358. Equity will not relieve from such mistakes of law. 41 Ark. 495; 46 Ark. 167; 49 Ark. 425; 68 Ark. 155.

It was plaintiff's duty to read his policy, and make timely objections, if it was not the kind wanted.   87 Fed. 63 ; 99 Fed. 862 ; 47 N. Y. 117 ; 62 N. Y. 178 ; 42 N. Y. Eq. 459 ; 56 Am. Dec. 329 ; 8 Am. St. Rep. 908 ; 27 Am. St. Rep. 809.   By accepting and retaining it, without objection, until after the fire, he assented to all its terms and stipulations.   62 N. Y. 178 ; 58 Ark. 281 ; 63 Ark. 200 ; 49 Conn. 167 ; 87 Fed. 65 ; 99 Fed. 861 ; Ostrander on Ins. 127.

A local agent has only authority to issue usual form of policy to cover a usual form of risk.   60 Fed. 351 ; 87 Fed. 63.   He has no power to vary or change the policy, or specific forms of the company commonly used.   11 Am. Rep. 128 ; 76 Iowa, 609 ; 61 N. Y. 594 ; 56 Mo. App. 359 ; 58 Mo. App. 431.   He has no authority to make any contract for reinsurance without specific agreement therefor on the policy itself.   183 U. S. (Northern Assurance case.)

Proof by plaintiff of loss based on ownership of others, and not on his interest as insurer to them, was not a compliance with the contract as sought to be reformed.   21 N. W. Rep. 145 ; 58 Mo. App. 431.   The proof of loss is material.   64 Ark. 594.   It would be inequitable to reform the policy to read as prayed for by plaintiff, without also reforming it so as to include a bookkeeping clause appropriate to the risk.   Issuing or contracting to issue an insurance contract that would deprive the company of the protection of an appropriate bookkeeping clause would operate as a fraud upon the company.   2 Pom. Eq. Jur. § 860.   If such clause was omitted by mistake, the court should correct that mistake also, or hold that the minds of the parties never met. Ostrander on Ins. § 4.

*T. C. Jobe* and *J. W. & M. House,* for appellee.

Where both parties understood the real contract, and by mutual mistake its terms were not incorporated in the written contract, equity has power to reform the contract to speak the truth and to enforce it as reformed.   29 Mo. App. 666 ; 136 U. S. 287 ; 40 Fed. Rep. 717 ; 13 Wall. 222 ; 1 Atk. 545 ; 9 Hare, 162 ; 1 Page, 278 ; 2 Curtis, 277 ; 2 Wash. C. C. 4 ; 4 Daly, 246 ; 5 Rawle. 342 ; 46 Miss. 645 ; 18 Abb. New Cases, 325 ; 4 Cliff. 192 ; 5 Sawyer, 304 ; 20 Wall. 494 ; Fed. Cases, No. 10498 ; 24 Fed. Rep.

625; Fed. Cases, No. 2051; 133 U. S. 387. It is immaterial whether the mistake was discovered before or after the loss occurred. 54 Md. 212; 13 Wall. 222; 21 *Ib.* 153; 31 Conn. 51; 36 N. Y. 550; 50 Pa. St. 331; 11 Barb. 624; 22 Conn. 575; 5 Sawyer, 304. The agent kept blank policies of the company signed by its officers, had power to solicit insurance, collect premiums, fill out the blanks in policies, countersign the same, and to change the slips attached to the policies so as to make them conform to the contract. His authority to act for the company was complete. 63 Ark. 187; 60 Ark. 539; 63 Ark. 204; 62 Ark. 348; *Ib.* 570; Joyce on Ins. § 386; 50 Ohio St. 558. A person clothed with power to act for the company at all is treated as clothed with authority to bind them as to all matters within the scope of his real or apparent authority. 2 Wood on Fire Ins. (2 Ed.), § 408; 51 N. Y. 117; 83 Ill. 46; 14 Wis. 318. That he is vested with powers of a general agent makes him one in contemplation of law. Joyce on Ins. § 395; 49 Kan. 178. Where one writes up and delivers a policy to the assured, indorsed with his name theron as "agent," he is a general agent with authority to waive conditions in the policy. 43 N. J. L. 652; 26 Iowa, 9. His knowledge and information in regard to the subject-matter of the insurance, the manner in which plaintiff carried on his business, bound the company. 52 Ark. 11. Where a custom is well understood by both parties, it will be presumed that the contract was entered into with reference to such customs. 34 Am. St. Rep. 350; 48 Am. St. Rep. 140; 130 Ill. 73; 41 Minn. 105; 62 Ark. 33; Abbott, N. C. (N. Y.) 471; 7 Hun, 482; 49 N. Y. 641; 51 N. Y. 641; 57 N. Y. 651; 58 N. Y. 373; Clark's Browne on Usage and Customs, 210.

Any defect in the proof of loss was waived by the company's offer to settle on a *pro rata* basis, and defendant is estopped from relying upon other grounds. 53 Ark. 494; 61 Ark. 108; 72 Ark. 365; 5 Minn. 492; 143 Pa. 388; 27 Am. Rep. 598 10 W. Va. 572; 71 Wis. 454; 30 N. E. 145; 61 Mo. App. 631; 62 N. Y. 85; 81 N. Y. 410; 36 Wis. 67; 96 U. S. 234.

McCULLOCH, J., (after stating the facts.) There is no dispute whatever about the facts of this case. It is clear that the form of the policy does not, if its language be held to embrace all

of the cotton in the warehouse, express the real agreement and intention of the parties thereto—appellee and the agent of appellant who wrote and delivered the policy and received the premium therefor. They both give the same testimony concerning the transaction, and both say that they intended to insure, not all the cotton in the warehouse, but only that part of it which appellee held on storage for farmers who held warehouse tickets showing that their cotton was insured.

The only question is whether the contract can be reformed so as to express the real intention and agreement of the parties, whether it is a mistake from which a court of equity will grant relief. An insurance policy may, either before or after the loss, be reformed so as to conform to the real agreement of the parties. *Phoenix Ins. Co.* v. *State,* 76 Ark. 180.

It is contended on behalf of appellant that, as the parties employed the language which they intended, and only mistook its effect, it was a mistake of law, against which a court of equity should not grant relief by reformation of the policy. It is well settled that ignorance of the law furnishes no ground to vary or set aside the solemn act of the parties to a contract in reducing it to writing, and that courts of equity will not relieve against a plain mistake of law, unaccompanied by other grounds for so doing. Judge Story, after stating this general doctrine, names certain exceptions, and says: "It is relaxed in cases where there is a total ignorance of title, founded on mistake of a plain and settled principle of law, and in cases of imposition, undue influence, misplaced confidence and surprise." 1 Story, Eq. Jurisprudence, § 137. "The true conclusion," says Prof. Bispham, "as to the general rule, would seem to be that equity will not interfere in the case of a pure mistake of law; but that any additional circumstance will readily be laid hold of by the court, as constituting sufficient grounds for interposition." Bispham's Equity, § 188.

In Pomeroy's Equity Jurisprudence it is said: "Whatever be the effect of a mistake, pure and simple, there is no doubt that equitable relief, affirmative or defensive, will be granted when the ignorance or misapprehension of a party concerning the legal effect of the transaction in which he engages, or concerning his own legal rights which are to be affected, is induced, procured, aided, or accompanied by inequitable conduct of the other parties.

It is not necessary that such inequitable conduct should be inten-
tionally misleading, much less that it should be actual fraud;
it is enough that the misconception of the law was the result of,
or even aided or accompanied by, incorrect or misleading state-
ments or acts of the other party." 2 Pomeroy, Eq. Jurisprudence,
§ 847; *Snell* v. *Insurance Co.*, 98 U. S. 85. *Snell* v. *Insurance Co.*,
98 U. S. 85, was a suit to reform an insurance policy, after the
loss of the property by fire, the facts being as follows: Keith, a
member of a firm who were owners of a lot of cotton, applied for
insurance to the agent of the company, stating to the agent the
facts concerning ownership, etc., of the cotton, whereupon the
policy was written in the name of Keith individually, and was
accepted by him upon the representation and agreement of the
agent that the entire interest of the firm was protected by the
policy.   The court, after stating the general doctrine that "a mere
mistake of law does not, in the absence of other circumstances,
constitute any grounds for reformation of a written contract,"
granted the relief, and said: "In the case under consideration,
the alleged mistake is proved to the entire satisfaction of the court.
It is equally clear that the assent of Keith to the insurance being
made in his name was superinduced by the misrepresentation of
the company's agent that insurance in that form would fully pro-
tect the interest of the firm in the cotton. We assume, as we
must from the evidence, that this representation was not made
with any intention to mislead or entrap the assured. It is, how-
ever, evident that Keith relied upon that representation, and, not
unreasonably, relied upon the larger experience and greater
knowledge of the insurance agent in all matters concerning the
proper mode of consummating, by written agreement, contracts
of insurance according to the understanding of the parties. He
trusted the insurance agents with the preparation of a written
agreement which should correctly express the meaning of the
contracting parties.   He is not chargeable with negligence because
he rested in the belief that the policy would be prepared in con-
formity with the contract."

   The same exception to the rule is stated in the case of *Gris-
wold* v. *Hazard*, 141 U. S. 260.

   Mr. Beach, in his work on Modern Equity Jurisprudence
(vol. 2, § 540) lays down this rule: "Where parties have made an

agreement, and there is no allegation of any mistake in it, and in reducing it to writing they, by mistake, either because they did not understand the meaning of the words used, or the legal effect thereof, failed to embody their intention in the instrument, equity will grant relief by reforming the instrument and compelling the parties to perform their agreement as they made it; and it matters not whether such a mistake be called one of law or of fact." *Pitcher* v. *Hennessey,* 48 N. Y. 415; *Oliver* v. *Mutual Com. Ins. Co.,* 2 Curtis, 277.

In *Lawrence County Bank* v. *Arndt,* 69 Ark. 406, where the officers of a private corporation, intending only to bind the corporation, were induced to sign their names to a note, adding after their names the respective offices held by them in the corporation, by the representation of the payee of the note that they would not be individually liable, the court said: "The note sued upon was prepared by the cashier of the bank, and was signed by the makers in the manner directed by him upon the representation made by him to the effect that they would not be individually liable, and that the note as signed was the obligation of the Manufacturing Company. They relied upon such representation, and they did not act unreasonably in doing so, because his vocation and experience were such as to enable him to better understand how such paper should be drawn and executed to accomplish the desired result, and to express the obligation the makers thereof intended to assume. They and the bank believed that the note was not their individual obligation, but the note of the Manufacturing Company. As evidence of this fact, each appended to his signature the name of the office he held in the Manufacturing Company. The conduct of the agents of the bank superinduced this mistake, and they accepted the note as obligation of the Manufacturing Company. Under such circumstances, a court of equity cannot deny relief without aiding the bank to take unconscionable advantage of a mistake for which its agents were chiefly responsible."

In the present case the insured relied upon the superior knowledge of the insurance agent, who knew all the facts concerning the location of the property, the method of handling and

keeping account of same and the particular class of cotton upon which insurance was desired. He had a right to so rely.

The language of the policy is peculiarly the language of the insurer. The policy is prepared by the insurer, and must be accepted, if at all, by the insured as prepared, without change, and when he does so upon representation of the authorized agent of the company that it covers certain property agreed to be insured, then a court of equity should reform it if not in accordance with the agreement and intention of the parties. Such circumstances form a distinct exception, as held by the authorities herein cited, to the general rule that mistakes purely of law will not be corrected by reformation of written instruments. Nor does it alter the rule that the original mistake occurred before the issuance of this policy, many years ago, when this kind of insurance first came into use in that locality. It was nevertheless caused by reliance upon the superior knowledge of appellant's agent at the time of the issuance of the policy, and on account of it the policy failed to express the real intention of either party.

But it is urged that the authority of the agent was limited, and he was not authorized to issue a policy such as is claimed this should have been. This view is not sustained by the facts. Bridewell, as agent for the company, kept policies for execution and delivery, passed upon applications, received premiums, countersigned and issued policies, and was therefore a general agent for such purposes. Having the conceded power to issue a policy on all the cotton in the warehouse, he undoubtedly had the authority to issue a policy on any portion of it. *Insurance Co.* v. *Brodie,* 52 Ark. 11; *Phoenix Insurance Co.* v. *Public Parks Amusement Co.,* 63 Ark. 187; *German-American Insurance Co.* v. *Humphreys,* 62 Ark. 348.

The method of bookkeeping practiced by appellee appears to have been in literal compliance with the express terms of the policy and was sufficient. That clause of the policy cannot be reformed, as asked by appellant, as the proof does not show that there was any agreement concerning this feature of the insurance, other than that expressed in the policy.

All alleged defects in the proof of loss were waived by denial of liability and refusal to pay, based on other grounds. *Planters' Mut. Ins. Assoc.* v. *Hamilton, ante* p. 27, and cases cited.

Thus far I have expressed the view of the majority of the court, but, speaking for myself alone, I find other reasons for reforming the policy and holding the appellant liable for the amount claimed. The alleged mistake was no more than a mistake in the description of the property intended to be covered by the policy of insurance.

In the case of *Knight* v. *Glasscock,* 51 Ark. 390, where the parties to an agreement for sale of land used the language intended in the description of the land, but made a mistake as to its effect in properly describing the land, this court held that a court of equity should reform the contract so as to conform to the real intention of the parties. I see no reason why the same rule should not be applied in this case.

It is my opinion also that the policy needed no reformation, and that parol testimony would have been admissible to identify and establish the subject-matter of the contract. The language of the policy does not in express terms describe necessarily *all* the cotton in the warehouse. The language is "$2,000. On cotton in bales," etc., in the warehouse, and it is only by implication that it can be said to describe all the cotton in the warehouse. It is a well-settled rule of evidence that parol evidence is always admissible to identify the subject-matter of a written contract. 17 Cyc. pp. 724-728 and cases cited; 2 Parsons on Contracts, p. 549; *Aetna Ins. Co.* v. *Strout,* 16 Ind. App. 160; *Franklin, etc., Ins. Co.* v. *Drake,* 2 B. Mon. 47; *Weber* v. *Illing,* 66 Wis. 79; *Goff* v. *Pope,* 83 N. C. 123; *Bigelow* v. *Capen,* 145 Mass. 270; *Pierce* v. *Parker,* 4 Metc. 80. The following is stated to be the law on this subject: "The general rule that parol evidence is not admissible to vary or contradict a written instrument precludes the admission of evidence to identify the subject-matter of a contract or the property described therein, when such evidence is inconsistent with what appears in the writing. But where a portion of the description is erroneous, the fact may be shown by parol evidence, and the property intended to be described may be identified, as this amounts merely to the rejection of the false reference in the description, pursuant to the well-settled rule of interpretation, *falsa demonstratio non nocet.*" 17 Cyc. p. 734, and citing cases.

The Supreme Court of Massachusetts in the case of *Bigelow* v. *Capen, supra,* said: "Parol proof of extrinsic circumstances may be admitted to apply a description to the subject-matter of a contract. If it appears that the description is not in all respects accurate, it may to a certain extent be rejected, and what remains alone regarded, if that be sufficient to identify it."

There is no reason why this rule should not apply to an insurance policy, as well as to any other contract, and it was so applied in some of the cases cited above. *Aetna Ins. Co.* v. *Strout, supra; Franklin Ins. Co.* v. *Drake, supra.*

Applying this rule to the facts of this case, it would be no contradiction of the terms of the policy to show by parol evidence that not all the cotton in the warehouse was insured by the policy, but only a certain portion of it. Of course, it would be different if the policy in terms read to cover *all* the cotton in the warehouse. Then it would be a contradiction to show that only a part was insured.

No error is found in the decree of the chancellor, and the same is in all things affirmed.

BATTLE, J., dissents.