56 So.2d 462 (1952)
SOUD
v.
HIKE et ux.
Supreme Court of Florida, en Banc.
January 15, 1952.
Rehearing Denied February 14, 1952.
*463 David J. Lewis and J.D. Raye, Jacksonville, for appellants.
W.A. Cleveland, Jr., and Bedell & Bedell, all of Jacksonville, for appellee.
BARNS, Justice.
This is an appeal from a final decree denying cancellation of two deeds to land and an accounting, sought on alternative grounds of forgery and fraud or undue influence. The deeds purport to have been executed by one Mary Hike, deceased. Joined as Plaintiffs-Appellants are John and Delores Hike, grandchildren of Mary Hike, who sue by their mother, guardian, and next friend, Amelia Hike, and S.K. Soud, Executor of the Estate of Mary Hike. Joined as Defendants-Appellees are Michael Hike, Mary's son, and his wife, Remsa Hike.
A hearing was held before a special master at which approximately 53 witnesses testified and some 1400 pages of testimony were taken, and the records and briefs now exceed 1800 pages.[1] The record indicates that Mary Hike was a woman of Syrian or Lebanese nativity, who with her husband, John, migrated to this country from Syria, now the Republic of Lebanon, in 1907. She mothered two children, David, born in Syria in 1905, and Michael, one of the Defendants-Appellees in this case, sometimes called "Mike," born in the United States in 1912. David had two children, John and Delores, Plaintiffs-Appellants in this case, by Amelia, a cousin on his mother's side, whom he married in 1921. The evidence shows that David was in business; that for several years his family made its home with his parents; that before David and Amelia separated, they moved out of the Hike household. The evidence further shows that in 1935 Michael married Remsa, a cousin on his father's side, and had two children by her; that except for a few months, Mike never did any work in his life; that he and his wife and children lived with his parents; and that he was supported by his parents from the time he was born until his mother's death in 1949.
Mary and John Hike were illiterate people who had had no schooling here or abroad. In over 40 years of residence in the United States, Mary never learned to conduct social or business affairs in the English language. It was necessary for both Mary and John to obtain interpretative assistance whenever they were required to read or write or to speak or understand the English language, and in the case of legal documents it was necessary to explain to them in Arabic what had been read to them in English. From the time that Mike started to attend junior high school, he performed the functions of family interpreter, and was his father's helper. Upon completion of his schooling, he retained these functions, having no other occupation, and his parents became increasingly dependent upon him for this assistance. After the death of her husband, John, in 1943, and son, David, in 1944, Mary became more helpless and more dependent upon Mike for assistance in the management of her *464 affairs. The evidence shows that for many years prior to her death in 1949 at the age of 80-85, she had been sick and infirm. Following the losses of her husband and first-born son, her health became progressively worse, so that she was bedridden a great part of the time. During this period, between 1944 and 1949, Mike took over complete management and control of her business affairs. He collected all money owed to Mary by her debtors, endorsed Mary's name to checks and disbursed her funds. He supervised the preparing of her income tax returns and arranged for the execution of legal documents as necessary. When legal documents were executed, he acted as interpreter and gave to Mary his explanation of the significance of such documents to which she affixed her mark.
Despite these handicaps, John and Mary prospered in the United States and accumulated substantial assets, consisting chiefly of two parcels of real estate in Jacksonville, Florida, the first known as "Five Points," having an estimated present value of $60,000, and the second a house called the "home" property, having a present estimated value of $15,000. These parcels of real estate constitute the subject matter of these proceedings.
It appears that in 1939 John Hike made a will leaving these parcels of real estate to his wife, Mary, with Mike named as sole beneficiary in the event that John died without leaving a surviving spouse. At the same time, Mary made a will leaving all her property to Mike in the event that her husband predeceased her. Defendants-Appellees introduced evidence that John had required Mary to give him a "solemn promise" that she would leave both parcels of real estate to Mike.
John died in August 1943. Less than a year later, the widow, Mary, lost in addition, her first-born son, David, who died on June 2, 1944, at age 39, leaving a son, John, 14 years old, and a daughter, Delores, 15 years old. A few months later, on August 3, 1944, Mary Hike modified the will she had made in 1939 and devised a half-interest in "Five Points" to her fatherless grandchildren, John and Delores, thus reducing Mike's prospective inheritance of "Five Points" by one-half. This modification was followed by another on September 30, 1946, by which a similar disposition was made of the "home" property  John and Delores were given a half-interest and Mike's prospective inheritance was reduced by one-half. There was evidence that Mary made these changes as a result of religious considerations. Witnesses testified that Mary had declared that she felt that David's "ghost or spirit * * * would never be satisfied" and she would never go to Heaven unless she did right by the orphan children," and that "the Lord `had told her' just what to do."
Mary Hike died at 2:00 a.m. January 14, 1949. At 8:48 a.m., the same day, Mike brought forth and recorded two deeds which he claimed had been executed by Mary Hike, one a deed to "Five Points," dated November 28, 1944, in which Michael and Remsa Hike are named sole grantees. Both deeds bear crosses purporting to have been affixed by Mary Hike. Both were prepared by the same person, an attorney, a stranger to Mary Hike, who had never done any other legal work for her, and had been engaged by Mike for the purpose of supervising the deed transactions. Plaintiffs introduced evidence to the effect that John and Mary Hike customarily employed attorneys Emmet Safay and Fred Rizk to do all their legal work, and that Emmet Safay had prepared Mary's wills devising real estate both before and after the deed to "Five Points." Mike testified that he engaged the stranger as Mary's attorney at her request. This man's office was conveniently located near the church which Mary attended. The record shows that apart from Michael and Remsa Hike, no one, not even close friends and relatives with whom Mary customarily discussed and to whom she confided her most intimate affairs, knew about the execution of these deeds. Mike admitted that he had kept the existence of these deeds secret, but testified that such secrecy was by prearrangement with Mary, who hoped in this manner to avoid family dissension.
Plaintiffs contend that the deeds in question are null and void, claiming that the crosses affixed thereto as Mary Hike's signature *465 are either forgeries or were affixed by Mary only as a result of either fraud or undue influence. At the hearings, most of Plaintiffs' evidence was directed at the issue of undue influence, and both the Master in his Report and the Chancellor in his decree approached the case almost exclusively from this standpoint. Plaintiffs' evidence of fraud and undue influence is largely circumstantial. There is the peculiarity that each of these "deeds" closely followed the execution by Mary of a will in which Mike's inheritance was reduced, and each deed purported to undo such reduction. There is also the circumstance that so long as Mary was disposed to vest Mike with total ownership of "Five Points" and the "home" property, disposition by will, prepared by Attorney Emmet Safay, who understood Arabic, and thus could converse with Mary, seemed satisfactory to all concerned; but each time Mary became disposed to reduce Mike's inheritance, the use of the will as a means of eliminating such reduction became unsatisfactory and deeds prepared and executed under the auspices of another attorney, who understood no Arabic, and could not converse with Mary, were resorted to. The "deeds" purport to convey to Mike and Remsa substantially all of Mary's property, so that almost nothing remained for John and Delores under the will, yet the wills remained unaltered. Plaintiffs contend that Mike and Remsa had beaten, abused and mistreated Mary. Attorney Emmet Safay testified that on one occasion he saw Mike waving his arms at his mother and heard him shout and curse at her in Arabic "that she was a bitch and he hoped she would die, and he would say go ahead and die." Emmet Safay further testified that on another occasion he saw Mary "begin to shake" upon Michael's entrance into the room. There was evidence that Mary took a trip to Miami to escape the turmoil of her own home. Over defendants' objections a long line of witnesses testified to having seen Mary with bruises and black eyes, and to conversations with Mary in which she is reported to have complained that "Remsa had hit her over the head with a shoe," that "Mike beat her," etc.
Defendants denied that they had committed fraud or exerted undue influence on Mary. They claimed that the deeds were genuine and had been voluntarily executed by Mary. The substance of their testimony in support of the legitimacy of their claims of ownership of Mary's properties was this: that Mary desired to convey the ownership of "Five Points" and the "home" to Mike and Remsa during Mary's lifetime instead of after her death as she had promised her husband before he died; that with this in view she instructed Mike to obtain the legal description of the properties from the courthouse and to engage the attorney in the case to draw deeds effecting immediate transfers of such ownership to them; that in order to avoid dissension in the family, Mary desired to keep secret the fact that she was making these conveyances, and to this end directed Mike not to record the deeds until after her death; that the deeds correctly express Mary's understanding and desires, and the subsequent conduct of all parties was in accord with such understanding and desires, which underwent no change thereafter. Defendants insisted that they had treated Mary with kindness and presented witnesses who testified in their behalf that they had witnessed such kindness, and who reported conversations with Mary in which the latter praised Remsa highly.
The attorney who prepared the deeds had no personal knowledge of Mary's cognition, intent or purpose when she affixed her marks. In preparing the deeds for Mary's signature, he obtained the information as to Mary's desires upon which he acted from Mike, and he did not at any time check with Mary to verify that such information so received was a correct representation of her wishes. At the time the forms were executed he heard a conversation in his presence between Mary and Mike. But the conversation was in Arabic, a language which he did not understand. He, therefore, had no personal knowledge of what Mike said to Mary or she to him. He did not know, except from hearsay, whether Mike explained to Mary the meaning of the words in the deeds, or, if he did do so, whether it was correct and adequate. He took no independent *466 precautions to assure that the deeds correctly expressed Mary's understanding of the transactions into which she entered. The only living individual with personal knowledge of the nature and extent of Mary's cognition is Mike. The Master found that a confidential relation existed between Mary and Mike. He rejected as untrue Defendants' explanation of the execution of the deeds. His Report states, "The Master is not satisfied that Mary Hike knew what papers she was executing." He made no finding as to what type of instrument Mary thought she was executing, but concluded that while the marks affixed to the deeds as Mary's signatures were genuine, the instruments were null and void as a consequence of Defendants' fraud or undue influence and that they should be cancelled and an accounting ordered.
Upon exceptions taken by the Defendants the Chancellor found that a confidential relation existed between Mary and Mike, but that Plaintiffs had not maintained their buredn of proving the invalidity of the deeds and entered a decree denying cancellation and an accounting. The question before this court is whether the Master's conclusions were sound, and whether the Chancellor erred in not sustaining them.
The statutes of this State prescribe a form which may be used to convey real property. F.S. Sec. 689.02, F.S.A. They stipulate that this form shall be held to contain the common-law convenants of a warranty deed. Our statutes do not say or mean that prescribed execution of one of these forms by the owner invariably results in a binding conveyance of property. Nor do they undertake to indicate the circumstances under which this form will have that effect. For the answers to these questions, we must look to our common law. By F.S. § 2.01, F.S.A., this includes designated portions of the "common and statute laws of England" down to the fourth day of July, 1776. By judicial construction it also includes the substantive principles of equity as well as those of law. So defined, our common law teaches that a binding transfer of ownership does not always follow execution of one of these forms in the prescribed manner. Sometimes failure of the form correctly to express the understanding of the parties as to the nature of the transaction and the rights to be created, conveyed, or retained by it, causes it to fail in its apparent purpose.
If the deeds and the portion of Mike's testimony above described were the only evidence in this case, we would be inclined to sustain the conclusion of the Chancellor that defendants are the lawful owners of the properties by valid deeds inter vivos delivered to them by Mary Hike. The recorded executed forms purport to convey the property to them and this portion of defendants' testimony indicates that the forms correctly expressed Mary's desires and understanding. The fact that Mike's testimony concerned matters in which he had a large financial interest and was self-serving neither disqualified him as a witness nor necessarily required that his testimony be rejected as untrue.
While Mary is dead, the records of her conduct, from the time she executed the forms until her death, survive in writings and in the memories of living witnesses.
At no time during her life did Mary treat Mike and Remsa as the owners of "Five Points" or the "home" property. From this fact it followed that she did not intend them to be such owners, for nothing prevented her from treating them as owners if she had intended them to be such. Since no claim was made that Mary's intent changed following execution of the forms, and it appeared that the conduct of all parties following such execution was in accord with their understanding at the time of execution, it was a reasonable deduction that Mary did not intend to make conveyances inter vivos when she executed the forms. The evidence was convincing, moreover, that Mary did not know or understand that the forms which she executed purported to be conveyances inter vivos. At no time before Mary's death did Mike or Remsa assert any claim of ownership or exercise a single act of dominion over either of the properties as owners, but always treated Mary as owner, and, furthermore, Mary continued to receive the rents and profits from the properties. She did not receive them as gifts *467 from Mike and Remsa, but as owner of the properties with complete control of their disposition, and subject to all the legal liabilities of one who receives rents and profits as an owner of real property. Mike, Mary's rent collector and business emissary, testified, "Mother's decision" determined the disposition of the rents, and that he left this matter "entirely up to her." The rents were reported on Mary's income tax returns as receipts from real estate owned by her, on information supplied to the accountant by Mike. Mary paid the taxes on the properties. The minutes of the Board of County Commissioners for July 25, 1946, almost two years after the purported conveyance of "Five Points," show that "Mrs. John Hike, Sr." requested a reduction in assessment on that real estate.
In 1945, a few months after the execution of the deed to "Five Points," and then again in 1948, Mary executed leases to stores in the "Five Points" property with Mike's knowledge and assistance. In 1945 or 1946, Mary reiterated to the family attorney, Emmet Safay, her desire to leave half of the "Five Points" property to David's children, John and Delores. On information which Mike admits having given to Mary's tax accountant, it was reported in Mary's returns that Mike received payments of $2400 in each of the years 1944, 1945, 1946 and 1947 for services rendered in managing the real estate which Mike and his wife, Remsa, now claims belonged to them all during that time. Mary received the rental income from "Five Points," because the income belonged to her, and "Five Points" belonged to her, otherwise, as Mary's accountant must have known, there could have been no purpose in reporting the income and making the charge, and it would have been simpler not to report the income and to avoid needlessly filing a false tax return.
In support of their position that Mary had intended to make voluntary conveyances inter vivos, defendants relied heavily on Mary's "solemn promise" to her husband that she would leave the properties entirely to Mike. This promise, however, was to leave the properties to Mike by will. Mary had not promised to convey them to Mike during her lifetime and thus deprive herself of her sole means of support and make it possible for Mike and Remsa to oust her from her home. Moreover, there was a change of circumstances after the promise was made which was brought about by David's unexpected death and the consequent loss by the grandchildren, John and Delores, of their source of support. Mary could have changed her mind about leaving the properties entirely to Mike, and the fact that she executed wills in which she left half interests in both properties to the grandchildren indicates that she did change her mind. The "solem promise" could have supplied Mike with a self-justification for attempting to prevent his mother from effectually changing her mind. Mike's treatment of his mother also may have been a contributing factor.
There was evidence given by Emmet Safay that sometime in 1946 Mary asked him to check the records in the courthouse to see whether any deeds of her property had been recorded. While this evidence is consistent with the conclusion that Mary knowingly executed deeds inter vivos of her property, it is also consistent with the contrary conclusion. Mary may have intended not to execute such instruments and, becoming suspicious that she may have unwittingly executed such conveyances, she may have desired Emmet Safay to take steps to confirm or allay such suspicions. Moreover, this testimony of Emmet Safay seems to contradict important portions of Mike's testimony. Mike testified that Mary desired to keep secret the fact that she had executed deeds inter vivos. At another time he testified that his mother trusted him "implicitly." In view of the fact that Emmet Safay was the family attorney and the instruments were drawn by a different attorney, Mary's request that Safay investigate the question of deeds is inconsistent with the notion that she had a desire for secrecy and with the existence of any "implicit trust" in Mike.
On the basis of the foregoing, we find that the Master was justified in rejecting as incredible defendants' version *468 of Mary's knowledge, intent and purpose when she affixed her marks to the instruments in question. Not only is this rejection supportable as an exercise of the Master's prerogative to pass on the credibility of witnesses where, as here, they have given conflicting testimony, but it is also supportable as an exercise of sound judgment in analyzing, in the light of common sense, the conduct of all the parties after the instruments were executed.
We believe, however, that the Master was unnecessarily cautious in his conclusion that he was "not satisfied that Mary Hike knew what papers she was executing," for we find that the evidence establishes affirmatively that Mary Hike neither intended to make conveyances inter vivos nor knew that she did make them.
Having determined that the instruments in question did not correctly express Mary's intent and understanding and that she did not know that she was executing conveyances inter vivos and that the Master's conclusions on these points were supported by the evidence, the next question before us is whether the Master's conclusion that the execution was attended by circumstances warranting cancellation and accounting is sound in law and fact.
Since Mary did not intend to execute conveyances inter vivos, and the forms executed were such conveyances, mistake attended execution of the instruments. This mistake related to the legal effect of the instruments executed. But on the facts of this case the variance also resulted from, and could result only from mistake or inequitable circumstances in the process of reducing Mary's intent and understanding to writing. Mary did not select the phraseology used in the instruments and, being illiterate, could not read their words or understand them by the use of her senses. In affixing her marks to the instruments, therefore, she did not accept these words, for better or worse, with full knowledge of their ordinary import, as the external manifestation of her intent. It is true that according to Mike's testimony the attorney acted as Mary's agent in the selection of the phraseology used in the instruments. But equity will regard substance rather than form, and the fact is that the attorney had no prior communication with Mary when he prepared these instruments, he received his information and instructions exclusively from Mike, and Mike being a grantee, was an adverse party in the transaction. In such cases it is well settled that equitable relief by information or cancellation will be granted for mistake, even if the transaction is unaccompanied by fraud, misrepresentation, concealment, undue influence, violation of confidence reposed, or other inequitable conduct. Dinwiddie v. Self, 145 Ill. 290, 33 N.E. 892; Wagner v. Glick, 177 Iowa 623, 159 N.W. 233; McGraw v. Muma, 164 Mich. 117, 129 N.W. 20; Baird v. Erie R. Co., 210 N.Y. 225, 104 N.E. 614; Dietrich v. Hutchinson, 73 Vt. 134, 50 A. 810; 3 Pomeroy's Equity Jurisprudence, 5th Ed., Sec. 845. In the past we have granted relief against mistake in cases where the mistaken party was able to read but failed to do so before signing. Taylor v. Glens Falls Ins. Co., 44 Fla. 273, 32 So. 887. The claim for relief in the case at hand where the mistaken party was unable to read is much stronger. Since inequitable conduct is not a condition to relief against mistakes of this type, Plaintiffs are entitled to relief against Remsa as well as Mike.
There is a second basis for granting equitable relief in this case. The evidence affirmatively establishes that Mary's mistake was induced by Mike's nondisclosure of material facts. Mike Hike knew that the instruments which she executed were purported conveyances inter vivos. He arranged for and supplied the information upon which the instruments were prepared. Mike's position is that Mary intended to make conveyances inter vivos and knew that the instruments were such conveyances. The fact that Mike claimed that Mary knew their nature proves that Mike was cognizant of it even though Mary was not. Moreover, he also knew that Mary did not know it. Being illiterate and unable to converse with the attorney, Mary could not have known the nature of the instruments which she executed unless Mike apprised her of it. Both Mary's and Mike's subsequent conduct with relation to *469 the properties showed that Mary had not been apprised of it. If equitable relief against mistake will be granted in absence of inequitable conduct, it seems clear that it should be granted when inequitable conduct contributes to such mistake. Indeed the courts should go further in cases where there is inequitable conduct, even though such conduct falls short of actual fraud and there is no violation of trust and confidence. Consistent with this it is generally held that where ignorance or misapprehension is induced, procured, aided, or accompanied by inequitable conduct, relief will be granted not only in cases where the mistake lies in the written expression of the understanding but also where it concerns the legal effect of known or knowable phraseology. The misapprehension of the law by one party of which the other is aware at the time of entering into the transaction, but which he does not rectify, is the ground of relief. Medical Society of South Carolina v. Gilbreth, D.C., 208 F. 899; Bayne v. Cinak, 320 Ill. 23, 150 N.E. 344; Faxon v. Baldwin, 136 Iowa 519, 114 N.W. 40; Phoenix Assur. Co. of London v. Boyette, 77 Ark. 41, 90 S.W. 284; Copper Belle Mining Co. v. Gleeson, 14 Ariz. 548, 134 P. 285, 48 L.R.A., N.S., 481; Pomeroy, supra, Sec. 847.
There is a third basis for relief. Both the Master and Chancellor found that a relation of trust and confidence existed between Mike and Mary with relation to his function as her general business emissary and interpreter of legal documents and other papers and transactions involving use of the English language. This finding is supported and must be taken as established by the evidence. In his capacity of fiduciary, Mike was under an affirmative duty to make full disclosure of the nature and legal effect of the instruments he arranged for Mary's execution and to exercise reasonable diligence to see that she was not misled as to these matters. The purported legal effect of these instruments which were prepared by the attorney upon information supplied by Mike and executed under Mike's supervision, was to make immediate conveyances of Mary Hike's property to himself and his wife, but his subsequent conduct in permitting Mary to exercise the prerogatives of ownership, and in acting as if no conveyances inter vivos had been executed, was calculated to keep Mary in ignorance of the mistake which she made through his connivance. Such nondisclosure by a fiduciary in Mike's position is the equivalent of fraud in fact.
For the foregoing reasons, it appears and we find that the facts of this case presented ample basis for equitable relief and that the Master was warranted in recommending cancellation and accounting and that the chancellor erred in not sustaining the Master's conclusions.
The decree appealed is reversed, with leave for further proceedings not inconsistent herewith.
SEBRING, C.J., and CHAPMAN, THOMAS and ROBERTS, JJ., concur.
TERRELL, J., dissents.
MATHEWS, J., not participating.
NOTES
[1] In cases involving transcript of more than 300 to 500 pages, it seems that the practice of the U.S. Court of Appeals for the Fourth Circuit might well be adopted which practice provides by Rule 9 for the original records of the trial court to be transmitted to the appellate court pursuant to the new Federal Civil Procedure Rule 75(o), 28 U.S.C.A.

Rule 10 of the court requires briefs to be printed with the appellant printing as a part of his brief an appendix containing Master's Report, Final Decree or Judgment and "such parts of the record material to the questions presented as the Appellant or petitioner desires the court to read"; and that appellee's brief may likewise contain "such parts of the record as he desires the court to read and as have not been printed in the brief of appellant or petitioner."
The advantage of such a practice in this case would have saved the expenditure of over $985 for a copy but would have incurred the expense of printing of briefs with appendices. When briefs are printed the additional copies would be available and all justices could work on a case at one time and with the material matters being printed with the brief the judicial power could be more fully utilized.
If it is not deemed desirable to make such a rule compulsory it could be made optional. It would seem desirable to be made compulsory with large records unless otherwise ordered by the court and optional in all cases.