### WALLACE et al. v. SISSON et al.

### No. 14,566; June 9, 1893.

#### 33 Pac. 496.

Partnership.—S., W. & Co. Made a Business of Hiring Chinese Laborers to railroad and construction companies. No direct compensation was paid for this service, but the understanding was that S., W. & Co. were to have the right to furnish supplies to whatever men they obtained for the companies, which supplies were to be retained out of the men's wages. There being a scarcity of labor, S. proposed the importation of men direct from China. Not meeting with encouragement from the other partners, he took the matter to the president of the S. P. Co., and an agreement was perfected,

under which importations were afterward made. The secretary of the construction company, one of the parties signing the contract, testified that certain advances were to be made under the contract by his own company and by S., W. & Co., to cover the cost of importation; that, according to his recollection, S., W. & Co. signed the contract, and that the last he saw of it it was in the hands of W. The person who was to go to China to secure the importation was to act ostensibly for the S. P. Co., as that company was better known than the construction companies. Directions were sent by the S. P. officials to the steamship agent in China to make the advances and draw on S., W. & Co. for the entire amount. The clerk to whom the draft was presented at S., W. & Co.'s office, in their absence, claimed that they were not to pay it. The secretary of the construction company testified that he then had some conversation with the clerk concerning payment, in which reference was made to the contract. The contract itself was not produced. A large number of Chinese were imported, and worked for the construction company. Held, that there was not merely a privilege to furnish supplies, but a contract to which S., W. & Co. was a party, and which, at least by force of usage, gave them the right to furnish supplies to the men obtained thereunder, and on the death of one of the partners his estate was entitled to a share of the profits arising therefrom.[1]

**Partnership.**—The Rescission of a Partnership Settlement effected through fraud, and return of property received thereunder by the estate of a deceased partner, is not necessary to the maintenance of a suit for further accounting by the representatives of deceased.[2]

---

[1] Cited in Wallace v. Sisson, 114 Cal. 43, 45 Pac. 1000, a second appeal of the case, where it is held that, after reversal, the court below must at the retrial determine questions of law in strict accordance with the decision, by the higher court, but questions of fact it is not bound to the same strictness.

[2] Cited with approval in Oliver v. House, 125 Ga. 640, 54 S. E. 734, also a case of rescission of a contract of dissolution of a partnership, the court saying: "We are well aware of the general rule that, where a party has been induced to enter into a contract by fraud, he may either affirm or rescind, and that in case he desires a rescission, he must offer to return everything he has received under it. But this rule is not applicable to all contracts."

Cited and approved in Daniel v. Gillespie, 65 W. Va. 370, 64 S. E. 256, and the court there say that "the reason for differentiating such a case from one of rescission of a contract of purchase between strangers is apparent. Before the sale each had a right of possession, and the possession of each was the possession of the other. By giving notice of election to rescind, the purchaser virtually puts the seller in statu quo, except that he expects to retain the assets at their real value, with assent of the other party, without relinquishing his right to a just and fair settlement of the accounts."

APPEAL from Superior Court, City and County of San Francisco; J. P. Hoge, Judge.

Action for an accounting, brought by Emeline Wallace and Cora A. Herzstein against Joseph H. Sisson and Milo A. Burke, executors of A. W. Sisson, deceased, and Julia Ann Crocker, executrix of Clark W. Crocker, deceased. Judgment for defendants. Plaintiffs appeal. Reversed.

A. N. Brown (D. M. Delmas of counsel) for appellants; Mastic, Belcher & Mastic for respondents.

HAYNES, C.—Appeal from a judgment for defendants, and from an order denying plaintiff's motion for a new trial. A. W. Sisson, W. H. Wallace and Clark W. Crocker were co-partners in the name of Sisson, Wallace & Co. Wallace died intestate, October 2, 1881. This action was commenced in May, 1884, against Sisson and Crocker, and, Sisson having died before judgment his executors were substituted, and defendant Crocker having died since this appeal, his executrix was substituted in this court. The firm was organized about 1868, having its principal place of business at San Francisco, and subsidiary places of business at different points on the line of the Central and Southern Pacific Railroads during the construction and operation of those roads. The Pacific Improvement Company, the Western Development Company, and the Southern Development Company were corporations severally engaged in the construction of these railroads under contracts with the railroad companies. Sisson, Wallace & Co. were dealers in merchandise, but their principal business was procuring Chinese laborers for the railroad and construction companies, and furnishing them with supplies of food and clothing while laboring for those corporations. As Chinamen were needed for construction or repairs, orders were given Sisson, Wallace & Co. for the men, and these would be procured and forwarded. No compensation was paid by the corporations for this service, but there was an understanding that Sisson, Wallace & Co. should supply the men so furnished with food and clothing, out of the profits of which they would be compensated for their labor and expense in procuring them. The Chinamen labored under the immediate direction of the railroad or construction company,

who also kept their time; but the payrolls, when made out, were delivered to Sisson, Wallace & Co., and the money called for by the rolls was paid to them, and they retained the amounts due them from the Chinamen for supplies, and paid them the remainder. In June or July, 1881, more Chinamen were required than could be obtained here. One Koopman-schap suggested to Mr. Sisson that he could obtain in China all the men required, but it would involve the expense of procuring them, and of their transportation from China. Sisson communicated the suggestion to Mr. Wallace, who thought the risk too great to justify incurring so large an outlay. Sisson, however, took Koopmanchap to Charles Crocker, the president of the Southern Pacific Railroad Company, and introduced the subject of procuring men from China, and an arrangement was afterward perfected under which a large number of Chinamen were imported. What this arrangement was, who were parties to it, and whether it constituted a contract under which Sisson, Wallace & Co. had a right to supply the Chinamen for any definite time, or while they should labor for the construction company, are the principal questions involved in the appeal.

Mr. Wallace left surviving him, Emeline, his widow, Cora, his daughter (the plaintiffs), and a minor son. Mrs. Wallace was appointed administratrix of his estate and the guardian of the minor. Early in January, 1882, negotiations were commenced by the surviving partners for the purchase of the interest of the estate in the partnership, the offer being that they would pay the value of that interest as shown by the annual statement of the assets and liabilities, as of January 1, 1882. Mrs. Wallace insisted that she should be allowed the proportionate part of the value of the goodwill of the business, which was long established, and large and valuable, and also claimed, while admitting her inability to establish the fact that the Chinamen imported from China were so imported under a contract made before Mr. Wallace died, by which the firm had a vested right to furnish them supplies, that the profits which would accrue to the firm during the time they were to labor would amount to a very large sum, and that the estate should have its interest in these profits, or be compensated for them in the settlement. On the other hand, Sisson and Crocker insisted that there was no contract right; that all they had was

a mere privilege of furnishing supplies, which the corporations could revoke at any moment; and refused to allow anything for the goodwill, or for any profits to be realized from supplies to be furnished the Chinamen; that, if their offer was not accepted, they would proceed to liquidate the affairs of the partnership. Mrs. Wallace, admitting her inability to establish the fact at that time, and protesting that if she should ever be able to establish it, she would enforce her rights, accepted the offer made, and, in order to consummate the arrangement, gave bonds for the payment of the debts of the estate and procured a distribution, the sale of the interest of the minor being effected through the probate court. Plaintiffs, claiming to have discovered facts establishing a contract right to the said profits, brought this action for an accounting, alleging that eighteen hundred Chinamen were so imported; that the profits arising therefrom were $450,000, of which one-third belonged to the estate; that other contracts and rights were secured by said firm shortly before the death of said Wallace of the value of $50,000, charging fraud and concealment in relation to those contracts, and praying for a disclosure and accounting, and for judgment for the sum of $180,000, and for general relief.

The court, after finding the uncontroverted facts, and some controverted facts which do not require special notice, upon the principal questions at issue found, in substance, that there was no fraud, misrepresentation, or concealment on the part of defendants; that they informed the plaintiffs, and the plaintiffs well knew, that defendants believed that said business was becoming very lucrative, and that during the years succeeding would yield large and increased profits; that the firm of Sisson, Wallace & Co. did not enter into any contract, nor was there any contract or agreement whatever between said firm, and any of said corporations for the importation of Chinamen, or for the securing such men in China, or the forwarding of them to San Francisco, or the collection or payment of their wages, or the reimbursement of any sums advanced to pay passage money or other expenses, of collecting or forwarding men, or giving to Sisson, Wallace & Co. the exclusive right or any right to furnish said or any Chinamen with supplies, or with the privilege of deducting the accounts of said firm therefor from the wages of such laborers; that the

exclusive privilege which the firm had enjoyed for many years of furnishing supplies to the Chinese laborers was by mere sufferance upon a parol understanding with certain stockholders and officers of the railroad companies; that for the purpose of enabling the firm to protect itself against loss, and to collect the money due them, the pay-rolls were placed in their hands with funds to pay the laborers; that there was no contract giving to said firm any fixed or vested right to the privilege thus enjoyed, or giving any assurance to said firm that such privilege would be accorded to them for any time in the future.    These findings are not justified by the evidence.

Before discussing the circumstances under which these importations of Chinamen were made, it is necessary to understand the previous relation of the parties concerned.    It is quite true that Sisson, Wallace & Co. did not have a contract by which they were to furnish all the labor for the construction of these roads, nor any particular number of men.    These corporations were at all times at liberty to procure men through others, and, according to the testimony of Mr. Charles Crocker, did obtain men through others; but he further testified (and as to this there is no conflict) that whoever furnished men for the work had the exclusive right to furnish the supplies for them. F. S. Dauty, the secretary of the Pacific Improvement and Southern Development Companies, testified: "We looked to them [Sisson, Wallace & Co.] to get Chinamen.    They employed Chinamen for us, and sent them down there, and we paid them the proceeds of the Chinese labor.    Some one connected with the company would give them an order for whatever men we wanted."    Mr. Charles Crocker testified that this mode of transacting the business dated back to 1864.    No exception to it is shown to have occurred.    Mr. Douty testified that it had been the custom since he knew anything about the business; that it was a great convenience to them, and enabled them to perform their business with one person instead of a large number of Chinamen who would be employed.    This arrangement was, in substance and effect, that Sisson, Wallace & Co. hired the Chinamen to work for them under the direction of the construction companies, at wages agreed upon, and Sisson, Wallace & Co. were paid the whole amount of their wages.    There was no contract relation between the Chinamen and the construction companies; the contract was with Sisson,

Wallace & Co. There was, however, no contract with Sisson, Wallace & Co. that they should furnish all the labor required until the roads should be completed, nor for any definite length of time. Each order constituted a contract for the men furnished under it, and the men so furnished were the employees of Sisson, Wallace & Co. so long as they remained upon the work. This, I think, was clearly the effect of the arrangement. But, if I am wrong in this conclusion, it was a custom, uniform and without exception, that they should have the right to furnish them supplies so long as they worked upon the road; and this custom became a term of the contract between Sisson, Wallace & Co. and the railroad and construction companies, attached to every order to the firm to furnish men, as fully as though it had been incorporated in each order given. "Any local or special custom or usage upon the subject will govern as an implied term in the contract between the parties": Hayes v. Wells, Fargo & Co., 23 Cal. 189, 83 Am. Dec. 89. See, also, Taylor v. Castle, 42 Cal. 367, 371. "Every legal contract is to be interpreted in accordance with the intention of the parties making it. And usage, when it is reasonable, uniform, well settled, not in opposition to fixed rules of law, not in contradiction of the express terms of the contract, is deemed to form part of the contract, and to enter into the intention of the parties": Walls v. Bailey, 49 N. Y. 464, 10 Am. Rep. 407, and cases there cited. If it be said that the railroad and construction companies could not prevent others from coming into competition with Sisson, Wallace & Co. in furnishing supplies to their Chinamen, it is sufficient to reply that during construction, at least, the railroad was not open to business, and could refuse to allow their construction trains to forward supplies for laborers, except for those who had a contract right to do so. Prior to the importation of men from China, procuring Chinamen was always attended with some expense, and sometimes Chinese labor was scarce, and at such times Sisson, Wallace & Co. were compelled to pay a bonus; but when the importation of men from China, which would require the payment of the passage money and the expenses, was suggested to Wallace, he objected that the risk was too great, and hence the special arrangement afterward made. That a written contract was made between one of the construction companies, Koopmanschap, and Sisson, Wallace & Co.,

concerning such importation, is clear, though such written contract was not produced on the trial, nor shown to be then in existence.

F. S. Douty testified that in 1881 and 1882 he was secretary and treasurer of the Pacific Improvement Company and of the Southern Development Company; that he remembered something of an instrument purporting to be a contract between one of those companies and Koopmanschap, and he thought Sisson, Wallace & Co., "by which Koopmanschap was to go to China, and get a thousand Chinamen; that he was to have $15 a head, to be used as compensation for his services, and the Pacific Improvement Company or Southern Development Company were to pay this $15 a head, which was to constitute his consideration. . . . . Neither of the companies would recover any portion of it again, and these companies were to pay the transportation of the Chinamen from Hongkong, or the shipping point, to San Francisco, and Sisson, Wallace & Co. were to advance $15 a head. This $50 (transportation) and this last $15 I have mentioned were to be collected back from the Chinamen. That was the sum and substance of the thing that was to be carried out as far as it could be." He further testified that the Chinamen were guaranteed work for a stated time—he thought one year—and were to receive $30 per month; that he signed it as secretary, and affixed the seal of the corporation; that his recollection was that it had been signed by Koopmanschap and Sisson, Wallace & Co., before he signed, but he was positive as to Koopmanschap's signature. and that Koopmanschap and Wallace were both present when he signed it; that he signed it by direction of Mr. Charles Crocker, and that he last saw it in the hands of Mr. Wallace, and his best recollection was that it was signed by Sisson, Wallace & Co. Koopmanschap was to act ostensibly for the Southern Pacific Railroad Company, as that corporation was better known in China than the construction companies, and was furnished with blank contracts to be executed by him as agent, and by the Chinamen. By this contract the Chinamen agreed to labor for the railroad company for eighteen months from the date of the commencement of labor, at $30 per month, they to provide their own food and lodging, but to be furnished transportation and provisions from China to the place of destination, and in this contract the Chinamen

acknowledged the receipt of $65 each as an advancement to be deducted from their wages. For the information of the agent of the Occidental & Oriental Steamship Company at Hongkong, a copy of the above-mentioned contract was sent to said agent with the following letter:

"Per 'Gaelic.'

"Occidental and Oriental Steamship Company."

"General Office.

"San Francisco, July. 7, 1881.

"Mr. C. H. Haskell, Jr., Agent, Hongkong—

"Dear Sir: Mr. Koopmanschap goes to Hongkong by 'Oceanic,' which follows the bearer, to arrange for the hiring of about 1,000 Chinamen for labor on the Southern Pacific Railroad. They are to be forwarded in two lots by our steamers, and contracts will be made by Mr. Koopmanschap, as per copy inclosed. The object of this letter is to make the following authorizations to you: First, advance to Mr. Koopmanschap the sum of fifteen dollars ($15) per head, to cover expenses in Hongkong; second, advance to the agent of the Chinamen fifteen dollars ($15) for each man as a bonus to him; third, issue tickets for the Chinese at the regular rates, taking the acknowledgment of the proper person. These advances are, of course, not to be made until the Chinamen go on board. You will then send me a draft on Messrs. Sisson, Wallace & Co., of San Francisco, for the entire expense, namely, passage money and $30 each extra in U. S. gold coin by the steamers bringing the men. In order that you may have sufficient funds to cover the advances referred to, we have cabled you to make no remittances to us at present.

"Very truly yours,

"CHARLES F. CROCKER,

"Vice-president."

The first shipment of the Chinamen arrived at San Francisco, September 29 or 30, 1881, two or three days before the death of Mr. Wallace, whose condition had not permitted his presence at the office of Sisson, Wallace & Co. for some weeks, and whose illness had lasted for several months. Mr. Sisson testified that before the arrival of the steamer he had arranged with the Merchants' Exchange to notify Sisson, Wallace & Co. of the approach of the steamer; that he met the steamer in the

bay with a lighter; received the lists of the Chinamen, and the contracts they had executed with Koopmanschap, took the Chinamen on the barge to the Oakland wharf, put them on the cars, and went with them to the places at which they were to labor.   On September 30th the draft drawn by Haswell, the agent of the steamship company at Hongkong, for $22,560, pursuant to the above letter from Charles F. Crocker, was presented to Mr. Scott, the head man of Sisson, Wallace & Co., Mr. Wallace being then on his deathbed, Mr. Crocker absent in Europe, and Mr. Sisson absent with the Chinamen on their way to the front.   Concerning the payment of this draft, Mr. Douty testified that he had some conversation with Scott by telephone to the effect that Scott contended that he should not pay it; that witness told him to look at his contract, and Scott replied that he had no contract.   "Well," I said, "then find it, because you are to handle this; but, whatever there is, if it is not perfectly understood, we will make you good in that matter."   This draft was for $80 per man ($22,560), and was afterward repaid by the Southern Development Company, except the $15 per man advanced by Sisson, Wallace & Co., and which they were to collect from the Chinamen.

The foregoing conversation between Douty and Scott, in reference to the contract and payment of the draft, occurring while the matter was still fresh in Mr. Douty's recollection, is strong evidence, not only that the contract was made and signed by Sisson, Wallace & Co., but that it provided for the payment of these drafts by them.   Besides, the letter of Charles F. Crocker to Haswell not only corroborates Mr. Douty as to the terms of the contract, but it is inconceivable that he would direct the agent of the steamship company to draw drafts upon Sisson, Wallace & Co. for each of the two contemplated shipments, amounting to $40,000 each, without a contract right so to do.   If further corroboration were needed, it would be found in the fact testified to by Mr. Douty that Mr. Charles Crocker sent for him; that he found Koopmanschap and Wallace there; that Mr. Crocker directed him to execute the contract; that Koopmanschap and Wallace were both present when he signed it; that he last saw it in the hands of Wallace, and that the importations were in fact conducted in the manner and according to the terms of the contract, as narrated by him.   It is true it is not stated by Mr. Douty, nor

by any witness, that the written contract provided in terms that Sisson, Wallace & Co. were to have the right to supply these Chinamen during their term of labor, nor was it necessary that it should, in view of the long-continued custom or usage existing in that regard. Sisson, Wallace & Co. advanced $15 per man, and took their chances of collecting it from the wages of the men. They had no recourse to the development company in any event. If the steamer and all the Chinamen had gone to the bottom of the ocean, they would have been liable for the $15 per man advanced for them by the steamship company, and this was a good consideration for the contract. Nor was their connection with the matter to end with the collection of this $15 out of the wages of the Chinamen. They were to collect the $50 passage money for the development company by keeping out of their wages ''as much as they could stand'' until it was repaid, as appears by the testimony of Mr. Crocker, who made the arrangement. Mr. Horn, a witness for plaintiffs, testified that he copied a contract relating to the importation of those Chinamen in the office of Sisson, Wallace & Co., and, while he is clearly in error in some particulars, and inconsistent in others, it is apparent that he had a knowledge of facts that he could not have known unless he had seen such a contract, or learned them in some manner in Sisson, Wallace & Co.'s office; and, if the firm and its other employees had no knowledge of such contract or agreement, he could not well have learned it from them.

Respondents contend that, however the fact may be in regard to a contract of the character above stated, there was such a conflict of evidence as will not permit the finding to be disturbed. It is true Mr. Crocker testified, as did other witnesses, that under the prior course of business Sisson, Wallace & Co. had a mere privilege of supplying the men which they procured; that there never was any contract; that it was simply an understanding. But that is a conclusion erroneously drawn from the facts to which they testify; and as to the imported men Mr. Crocker did not remember that there was a contract, and the defendants and their employees testified that they never knew of such, or any, contract. A careful reading of the testimony, however, will show that these witnesses also testify to conclusions, rather than to the facts which constituted the terms of the contract, and they especially em-

phasize their denial and that there was any contract giving them the right to supply the imported men with food and other merchandise. These denials are not sufficient, in view of the whole evidence to create a doubt that there was a contract or agreement for the importation of these Chinamen to which Sisson, Wallace & Co. was a party, and which, at least by force of usage, gave them an exclusive contract right to supply them during the term of their employment; and evidence not sufficient to create a doubt cannot be held sufficient to raise a material conflict.

It is further contended that plaintiffs had as full knowledge of all the facts at the time of the settlement as the defendants. Mrs. Wallace admitted that she had known for ten years the general course of the business, and expressed her belief that there must have been a contract relating to the importation of these Chinamen; but defendants denied that there was such a contract, and this they still deny. They cannot, therefore, contend that she knew of a contract which they say never existed, for to do so would be to admit what they deny. Nor does it appear that they ever informed her of the existence or contents of the letter to Haswell, which had been copied in their office; nor that the drafts had been drawn upon and were paid by them; nor that the firm advanced $15 to each Chinaman, and which they were to collect from his wages; nor that they were to collect and pay to the construction company the $50 passage money; nor that, so far as the evidence discloses, all the communications sent to Koopmanschap while he was in China, in relation to this business, were addressed to Sisson, Wallace & Co., all of which were known to defendants before the settlement. The finding, therefore, that they did not conceal from plaintiffs, "or fail to disclose to them, any fact within their knowledge concerning the same," cannot be sustained.

Respondents further contend that, if the contract of settlement was procured by fraud, misrepresentation, or concealment, plaintiffs' only remedy is by rescission; that they cannot affirm in part and reject in part, and are, therefore, not entitled to recover on their complaint. It is true, as a general rule, that a rescission must be entire; that a party to a contract, who desires to rescind it, must surrender up everything he has received under it; and these rules apply generally to

contracts of purchase and sale. They do not apply, however, to all cases of contracts. In this case Wallace's heirs could not become partners in the firm without the consent of the survivors. Mrs. Wallace testified that Sisson proposed to her to permit the interest of the estate to remain in the business at least for a year; that it would be profitable, and that she understood until about January 3, 1882, that it would so remain, when she was informed that such an arrangement would not be made; that it was proposed to take into the firm four of their employees; that they would pay the estate what the annual statement would show they were entitled to, viz., $153,-748.20; that she insisted the estate should be allowed for the goodwill of the business, and for the profits which would accrue from supplies furnished the imported Chinamen, and that she had been offered by a business man $25,000 more than the sum they offered. Plaintiffs could not retain their interest in the firm, nor sell to a stranger, without defendants' consent. The sum offered she was at least entitled to. It did not belong to the surviving partners. In paying that sum they did not part with their own money or property. It was a settlement of the partnership affairs. It was not a voluntary transaction in the broad sense of an ordinary contract. She (and we use the term as representing the heirs) had her choice of two alternatives: to take what was offered, or submit to a liquidation, and to this extent only was it voluntary. If it be true that there was concealment or misrepresentation, that all that was valuable was not brought into the transaction, that something was withheld that should have been estimated, can it be said that before she can have the wrong corrected she must refund to the defendants all that she has received, when she could not receive, hold, own and control that she had parted with, and which defendants retained, and that a court of equity cannot compel them, without such rescission and surrender, to account for that in which she had an interest, and which was not brought into the accounting upon which the settlement was had? Even if it were necessary to set aside the agreement, it could not be necessary that the money paid should be refunded. It is not claimed that defendants were in any manner deceived or wronged, or that they have paid money that plaintiffs were not in any event entitled to. The law does not require idle or unnecessary acts to be performed, and

surely it cannot be necessary that plaintiffs should put back in defendants' hands the money they have in order that they may recover it back with other moneys in addition thereto. These views are fully sustained by the authorities: See Watts v. White, 13 Cal. 321; 2 Parsons on Contracts, 1, *p. 277, and note R; Pierce v. Wood, 3 Fost. (N. H.) 519; Elfelt v. Hart, 1 McCrary, 11, 1 Fed. 264. But in strictness this·is not an action for rescission, nor is a rescission necessary. The surviving partners have the legal right to the possession of the partnership property and assets, but for which they are required to account. The settlement had was but an accounting, and this action is only for an accounting of a matter not taken into the former accounting. The conclusion to which we have arrived renders it unnecessary to consider alleged omissions to find, and exceptions to evidence, none of which seem to cover any vital point. The judgment and order appealed from should be reversed and a new trial granted.

We concur: Searls, C.; Vanclief, C.

PER CURIAM.—For the reasons given in the foregoing opinion the judgment and order appealed from are reversed and a new trial granted.