MARY B. FAXON ET AL, Appellants, v. J. F. BALDWIN, Appellee.

**Vendor and vendee:** MISTAKE OF VENDOR: FRAUD: RESCISSION. Equity will not relieve a vendor by quit claim deed simply on proof that he thereafter discovered that the estate conveyed was greater than supposed; but where the grantee obtains the conveyance upon a valuation based on the belief of grantor that his interest in the property was less than it was in fact, and with knowledge of his mistake the vendee failed to disclose the truth, he is guilty of fraud and the conveyance may be set aside.

*Appeal from Fremont District Court.*—HON. O. D. WHEELER, Judge.

THURSDAY, DECEMBER 12, 1907.

ACTION in equity to have set aside a conveyance of real estate, and for other relief. On trial the petition of plaintiffs was dismissed, and they appeal.— *Affirmed* in part, and *reversed* in part.

*T. S. Stevens,* for appellants.

*R. C. Campbell,* for appellee.

BISHOP, J.— The real estate in controversy consists of two lots in the town of Hamburg, Fremont county. Mary J. Wise, widow of William Wise, died seised of said real estate in March, 1904. She left surviving her two daughters, the plaintiffs in this action, Mary B. Faxon, residing in Hamburg, and Catherine N. Risdom, residing in Los Angeles, Cal. It appears that William Wise, in his lifetime, had adopted as his son a boy thereafter known as Harry G. Wise. His wife, Mary J. Wise, did not, however, join in the articles of adoption. After the death of Mary J. Wise, Harry G. Wise, acting presumably upon the theory that he had an interest in the property, placed the lots in question in the hands of one Noble, a real estate agent, to be disposed of, and a purchaser was found by such agent in the person of the defendant. Plaintiff separately executed and delivered to defendant quitclaim deeds in ordinary form, and the amount paid to each by defendant was the sum of $333.33. It is alleged in the petition that the consideration for said lots as agreed upon was the sum of $1,000, one-third of which was to be paid to each of the plaintiffs, and one-third to said Harry G. Wise. And plaintiffs aver that, at the time of the sale and of the conveyances as made by them, they supposed and believed that Harry G. had also been adopted by their mother, and that he was equally entitled to participate in her estate; that it was upon this belief that they accepted the sum paid to them by defendant; and that they would not have done so

but for such mistake. It is then alleged that defendant at all times well knew that Harry G. Wise had no interest in the property, and that he concealed such fact to induce plaintiffs to sell and convey to him and to accept in payment each one-third of the sum of $1,000, the consideration as agreed upon. Mistake on the part of plaintiffs and intentional fraud on the part of defendant is variously alleged, and the relief demanded is in the alternative — for recision, or for judgment in the sum of $333.33.

Defendant denied in answer that the consideration agreed to be paid for the lots was $1,000, and pleaded that the transaction as it occurred amounted to no more than an offer on his part to accept of quitclaim deeds from plaintiffs, and to pay to each of them as consideration therefor the sum of $333.33, which offer was accepted and acted upon by plaintiffs. The answer admits that he knew at the time that Harry G. Wise had no interest in the lots, but denies that he concealed that fact, or otherwise misled plaintiffs.

Looking into the evidence, it appears that defendant is a banker residing and doing business at Hamburg. Noble approached him and offered to sell the lots in question for $1,000, and, as a witness, he, Noble, testifies that he told defendant that the property was owned by the Wise heirs, Mrs. Faxon, Mrs. Risdon, and Harry G. Wise; "that Mrs. Faxon had agreed to sell her interest for $333.33; that her sister would do the same; that terms on the other could probably be made better. Baldwin said he would not give $1,000 for the property. Said he would not arrange any farther than with Mrs. Faxon at the time, but would buy her interest and pay her $333.33; I told Mrs. Faxon so, and she said she would accept it." It appears that defendant consulted R. C. Campbell — an attorney of the town, and also engaged in operating a neighboring bank — respecting the value of the property, and was told by Campbell that Harry Wise had no interest in the property; that he was not one of the heirs of Mrs. J. Wise, deceased.

Campbell advised defendant that he pay each of the plaintiffs $333.33, and take a deed. It would seem that an arrangement was made between Noble, Campbell, and defendant, whereby Noble was to procure Mrs. Faxon and her husband to go to Campbell's bank and there execute a deed, defendant to leave with Campbell a check for $333.33 to be delivered upon such deed execution. Mrs. Faxon and her husband went to the bank on request of Noble, and accompanied by him. It is clear that at the time all three believed that Mrs. Faxon owned no more than a third of the property. And she declares that she would not have entered upon the deal had she been made aware of the truth respecting the extent of her interest. There is no material dispute in the evidence as to what occurred at the bank. Defendant was present part of the time, but it does not appear that he took any part in the conversation. Campbell drew the deed, and took the acknowledgments as notary. Mrs. Faxon testifies that, upon arrival at the bank, she at first objected to signing the deed, but her husband said they would never get more than $1,000 for the property, " after which I signed it." Further, she says that, when asked to sign, she spoke to Campbell, saying: " Why cannot you send this deed to Harry and my sister, and have them sign it? I won't stand back . . . if they sign it." Mr. Campbell just looked at the papers, and shook his head. Mr. Faxon testifies that it was said by Noble, in the presence of Campbell, that the property had been put in his hands for sale at $1,000, and Noble said that defendant was paying that price for it. And he says that he there told his wife that she had better sign, as she would never get more than $1,000. Noble testifies that " Baldwin told me at the time that he would purchase Mrs. Faxon's interest first, and would take Mrs. Risdon's interest at the same price, but would not purchase Harry's interest at that time." Campbell — called as a witness by plaintiffs — testifies that in the transaction " I was acting for Baldwin. I thought there

was a bargain in it." Being recalled by defendant, he answered that he had nothing to do with the sale, except in a legal way to make out the papers; that he had said nothing to mislead Mrs. Faxon; that nothing was said in his presence about Harry Wise, except that Mrs. Faxon asked that the deed be first sent for the signatures of Harry and Mrs. Risdon, whereupon he replied to her that, "Mr. Baldwin is buying your interest only, and no one else's." It does not clearly appear in evidence just how the interest of Mrs. Risdon was acquired. Defendant alleges in answer that he prepared a deed and sent the same to a bank in California, "with instructions that, in the event Mrs. Risdon desired to accept $333.33 for her interest and execute a quitclaim deed, to deliver the money and send deed to defendant, which was done." And this was probably the course pursued, as a deed properly executed at Los Angeles, as of the time, was introduced in evidence, also a draft in favor of Mrs. Risdon, which had been duly paid on her order. It was shown on the trial that the property was of greater value than $666.-66, and it was admitted that before suit plaintiffs had tendered a return of the money received by them.

This, in substance, is the case presented. In favor of Mrs. Risdon it is clear to our minds that there is no merit. As to her, there was no showing of fraud or mistake. As will be observed, the record is wholly silent as to what, if any, knowledge she had respecting the extent of her interest in the lots. She was not a witness, and, for all that appears, she was not communicated with except when the deed was sent to her for execution. We cannot, therefore, say that she did not know that her interest was one-half, and that she did not voluntarily convey on that basis. But, in our view, a different conclusion must be reached in favor of Mrs. Faxon. It is true, as contended for by counsel for appellee, that equity will not interfere to relieve a vendor of real estate by quitclaim deed simply on proof that such vendor is made afterwards to realize that the estate con-

veyed was to some extent greater than he had supposed himself possessed of; but that rule cannot be given application where, as here, it is made to appear that there was a mistake of fact on the part of the vendor as to the quantity of her interest, and that such mistake of fact was known to, and, as we think it must be said, fraudulently taken advantage or by her vendee. Defendant knew that Mrs. Faxon supposed her interest to be but one-third of the entire estate. He knew that this fraction was all she was offering to sell, and that the price demanded was fixed upon a basis of a valuation of the entire property at $1,000. Her mistake was as to the identity or quantity of her interest, not as to the quality or value thereof. While ordinarily equity will not relieve as against the latter, there is an abundance of authority for saying that, a proper case being made, it will as against the former. And it is immaterial whether the mistake be called one of fact or of law.

Mr. Pomeroy, after a scholarly and careful review of the subject, says: " The scope and limitations of this doctrine may be summed up in the proposition that, a misapprehension of the law by one party of which the other is aware at the time of entering into the transaction, but which he does not rectify, is a sufficient ground for equitable relief. A court of equity will not permit one party to take advantage and enjoy the benefit of the ignorance or mistake of law on the part of the other which he knew of and did not correct." 2 Pomeroy's Eq. Jur. (3d Ed.) section 847. And in 2 Warvelle on Vendors, section 789, after stating the general rule that a mistake must be mutual to warrant equitable relief, it is said: " An important distinction has been made in later cases, which to some extent modifies the rule as first stated. It will be found that in those cases where the rule has been enforced there has been an element of honesty on the part of the one correctly understanding the contract; and because the parties have fairly entered into the contract it cannot be amended as against the party correctly under-

standing it, he acting in good faith, and supposing the other party to have understood the contract as he did. But where there has been a mistake upon one side, and fraud upon the other, where the guilty party, though not mistaken himself, well understood the other party's error, and knowing the same executed the contract intending to reap advantage from such error, while the mistake is unilateral, yet the fraud of the other party will justify equitable intervention equally as though such guilty party had made affirmative representations to induce the error."

That a mistake by a grantor of the nature of the one here in question will uphold a decree rescinding or canceling a conveyance was distinctly held by this court in *Montgomery County v. American Emigrant Co.,* 47 Iowa, 91. In that case the county undertook and agreed to sell and convey to the emigrant company the remnant of its swamp lands; the agreement being " to sell, assign, and release to said company all the rest and residue of the swamp land interest of said county in law and in equity of whatever the same may consist and to as full and as great an extent as the county may hold or be entitled to the same." It appeared, however, that at the date of such contract the proper officers of the general government had issued to the Governor of this state, for the use of the county, script indemnity for four thousand seven hundred and thirty acres of land, a fact which the emigrant company knew, but of which the officers of the county had no knowledge, and this fact, unaccompanied by any showing or claim of fraud other than such as might be implied from the failure of the company to disclose the true condition of the title to the land, was held to afford sufficient ground for setting aside the contract. And there are many cases in the other states giving recognition to the principle. Thus in *Humphreys v. Hurtt,* 20 Hun. 399, the rule is affirmed that " if one party in the execution of a contract has delivered papers in supposed furtherance of it, but with knowledge of a mistake in his favor, which he

conceals, then equity will give relief to the other party if the mistake is clearly shown, although it be not mutual. The case comes under the head of constructive fraud on the part of one party and of mistake or error on the part of the other." And as said in *Renard v. Clink,* 91 Mich. 1 (51 N. W. 692, 30 Am. St. Rep. 458): "Where a person is ignorant or mistaken with respect to his own antecedent existing private legal rights, interests, or estates, and enters into some transaction, the legal scope and operation of which he correctly apprehends and understands for the purpose of affecting such assumed rights, interests, or estates, equity will grant its relief, defensive or affirmative, treating the mistake as analogous to if not identical with a mistake of fact." Other cases, among those that might be cited, where the subject is discussed and application of the principle made, are the following: *Wilson v. Moriarty,* 88 Cal. 212 (26 Pac. 85); *Wirsching v. Grande Lodge,* 67 N. J. Eq. 711 (56 Atl. 713); *Whelen's Appeal,* 70 Pa. 410; *Wilson v. Ott,* 173 Pa. 253 (34 Atl. 23, 51 Am. St. Rep. 767); *Haviland v. Willetts,* 141 N. Y. 35 (35 N. E. 958); *Crookston v. Marshall,* 57 Minn. 333 (59 N. W. 294, 47 Am. St. Rep. 612); *Clark v. Clark* (N. J. Err. & App.) 42 Atl. 98; *Titus v. Insurance Co.,* 97 Ky. 567 (31 S. W. 127, 28 L. R. A. 478, 53 Am. St. Rep. 426); *McCormick v. Miller,* 102 Ill. 208 (40 Am. Rep. 577); *Blakeman v. Blakeman,* 39 Conn. 320. And the cases are agreed that where such unilateral error or mistake appears, and the circumstances are not such that equity will reform and specifically enforce the contract, a recission will be allowed. In addition to the cases already cited, see *Board v. Bender,* 36 Ind. App. 164 (72 N. E. 154); *Rider v. Powell,* 28 N. Y. 310; Adams, Equity, 171.

It follows from our consideration of the case that the decree should be, and it is reversed as to plaintiff Faxon and affirmed as to plaintiff Risdon.— *Reversed* in part. *Affirmed* in part.