## CONNER v. CRAIG et al.

(Circuit Court of Appeals, Fourth Circuit. July 27, 1914. On Petition for Rehearing, September 8, 1914.)

No. 1229.

1. TENANCY IN COMMON (§ 35*)—MUTUAL DUTIES AND OBLIGATIONS OF CO-TENANTS—SALE OF PROPERTY—SUPPRESSION OF FACTS BY COTENANT.

Complainant and defendant C. were owners in common of a tract of timber land in West Virginia where C. resided, complainant being a non-resident. For many years C. had looked after the land for himself and as confidential agent of complainant. A firm of which C.'s son was a member wrote complainant, making an offer of about $20 an acre for the timber on his half of the land. This offer complainant communicated to C., asking his advice, and C. in answer stated that he thought the price too low; that he would not sell his interest at that price, but was offering all the timber at $40 an acre, and had hopes of making a sale; also that he would give complainant all the information he might obtain. Pending the correspondence, C., on behalf of himself and as complainant's agent, gave an option on all of the timber at $40 an acre, but although he wrote complainant the next day, he did not mention such fact, but permitted complainant, while such option was still outstanding, to give an option on his share to the son's firm at the price offered. The first option having expired, the one given by complainant was closed, and the firm and C. at once joined in a sale of all the timber at $40 an acre. *Held*, that C. as cotenant and agent of complainant was under the duty to inform him of all matters bearing upon the proposed sale, and that his concealment of the material fact that he was negotiating a sale at double the price offered was a fraud on complainant which entitled him, as against C., to share in the benefit of the latter's sale.

[Ed. Note.—For other cases, see Tenancy in Common, Cent. Dig. § 27; Dec. Dig. § 35.*]

2. TENANCY IN COMMON (§ 53*)—SALE BY COTENANT—VALIDITY OF CONTRACT—FRAUD PARTICIPATED IN BY PURCHASER.

The firm which purchased complainant's interest, having had knowledge of C.'s concealment from complainant of his own negotiations for the sale of the timber at a higher price, was affected by the fraud and precluded from keeping the benefit of their bargain, and complainant was entitled to recover the amount of the profit realized from the resale.

[Ed. Note.—For other cases, see Tenancy in Common, Cent. Dig. § 128; Dec. Dig. § 53.*]

3. PRINCIPAL AND AGENT (§ 158*)—SALE BY AGENT—VALIDITY OF CONTRACT—SUPPRESSION OF FACTS BY PURCHASER.

While it is a general rule that a purchaser is not bound to disclose his knowledge of the property to the vendor, the moment silence passes into suppression, the region of bad faith is entered and the rule does not apply, and where the purchaser knows that the vendor is misled by a breach of trust of his agent, by availing himself of such breach of trust he becomes a participant in it and cannot hold his bargain.

[Ed. Note.—For other cases, see Principal and Agent, Cent. Dig. §§ 589–598; Dec. Dig. § 158.*]

4. TRUSTS (§ 361*)—SUIT BY VENDOR TO ENFORCE TRUST—FRAUD OF PURCHASER.

In a suit in equity to establish a trust in the proceeds of a resale of property obtained from him by defendant for less than its true value,

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

through fraud in which defendant participated, complainant is not required to return the money received by him for the property.

[Ed. Note.—For other cases, see Trusts, Cent. Dig. §§ 556–559; Dec. Dig. § 361.*]

Appeal from the District Court of the United States for the Southern District of West Virginia, at Charleston; Benjamin F. Keller, Judge.

Suit in equity by Levietta B. Conner, administratrix of John S. Conner, deceased, against James S. Craig and another, trading as Craig & Wolverton, a partnership, and the Weston Lumber Company. Decree for defendants, and complainant appeals. Reversed.

Malcolm Jackson, of Charleston, W. Va. (W. W. Brannon, of Weston, W. Va., Brown, Jackson & Knight, of Charleston, W. Va., and Brannon & Stathers, of Weston, W. Va., on the brief), for appellant.

W. G. Mathews, of Charleston, W. Va., and W. G. Bennett, of Weston, W. Va. (Mollohan, McClintic & Mathews, of Charleston, W. Va., on the brief), for appellees.

Before PRITCHARD and WOODS, Circuit Judges, and DAYTON, District Judge.

WOODS, Circuit Judge. [1] In 1875 the commissioner of school lands conveyed a tract of land in Nicholas county, W. Va., containing about 2,200 acres, to James S. Craig and John S. Conner as tenants in common. By written agreement dated July 6, 1907, Arden L. Craig and John M. Wolverton, doing business as lawyers and dealers in real estate under the firm name of Craig & Wolverton, obtained from John S. Conner an option to purchase his one-half interest in the timber on the land at the price of $21,000, a little less than $20 an acre. By a similar instrument dated July 8, 1907, they obtained from James S. Craig an option on his one-half interest in the timber at $40 an acre. On July 10, 1907, Craig & Wolverton agreed to sell the timber on the entire tract to Weston Lumber Company and Ernest G. Smith at $40 an acre. In pursuance of his option, on August 6th Conner conveyed by deed his interest in the timber to Craig & Wolverton; and on August 14th Craig & Wolverton and James S. Craig joined in a deed conveying the timber on the entire tract to Weston Lumber Company. On May 23, 1908, James S. Conner filed his bill, alleging that he had been induced to give the option on his interest and to make the conveyance to Craig & Wolverton at much less than its real value, by fraudulent concealment and misrepresentation of James S. Craig and Craig & Wolverton, and that consequently he was entitled to share in the proceeds of the sale to Weston Lumber Company as if he had not conveyed to Craig & Wolverton and had been named as a party in interest to the sale of the timber at $40 an acre. The defendants by their answers denied the allegations of fraud and concealment, and set out in full their version of the relations of the parties and the negotiations which ended in the sale to Weston Lumber Company. Conner died during the pendency of the suit, and the cause was continued in the name of Levietta B. Conner, his administratrix. Aft-

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

er consideration of a great mass of evidence, including voluminous correspondence between the parties, the District Judge in a formal decree held that the plaintiff was not entitled to relief and dismissed the bill.

It is but just to say before entering upon a review of this finding that the evidence leads to the conclusion that James S. Craig, and A. L. Craig, who acted for Craig & Wolverton, believed themselves to be acting within their legal rights in their transactions with Conner. But their belief cannot protect them if Conner suffered loss, by reason of their dealings with him, which courts of equity hold to be fraudulent in the sense that they were unfair. The books are full of cases in which bargains have been annulled because the parties acted on their own standards of right below the standards which courts of equity enforce. The conclusions of the district judge who tried the cause must always have great weight, but in this instance facts which seem decisive are not in dispute, and this court must draw from them its own conclusions.

The perspective will appear from a statement of the relations of the parties. John S. Conner was a jurist and afterwards a practising lawyer living in Cincinnati, Ohio, having little personal knowledge of the quantity and value of the timber. James S. Craig lived in West Virginia near the land, and, though he had not had it surveyed or the timber estimated, he had bought and sold similar property and was familiar with market values. For about 30 years he had the entire management of the land, paid taxes and other expenses, conducted suits involving the title, and in all respects acted for himself and for Conner. From time to time he made statements of his accounts to Conner, and occasional adjustments were made. Although he and Conner seldom met, their relations were those of warm friendship, and Craig had voluntarily assumed toward Conner the position of a trusted agent and manager of the land. A. L. Craig was the son of James S. Craig, but he sustained no trust relation to Conner, and was of course free to deal with him at arm's length and to buy his timber at the lowest price. In 1907 Conner was in failing health, and though not in financial distress needed money and was anxious to sell his interest in the timber if a fair price could be obtained.

The negotiations were opened by a letter from Craig & Wolverton to Conner dated March 23, 1907. Conner was in great perplexity as to the price and the wisdom of making a sale and sought advice and information from his friend and agent, James S. Craig. In responding to this call, Craig, except in two particulars, fully recognized and discharged his trust as the confidential adviser and agent of Conner. He told him in interviews and letters that he thought timber would advance in price, that he would not sell his own interest at the price offered, and that he expected at some time in the future to get $40 an acre for the timber on his share of the land. He reminded Conner of his embarrassment in advising him in reference to a trade with his own son, but promised to give him all the information he himself might have. He wrote on June 18th, after mentioning a number of sales of similar timber at smaller prices,

"still, in my own right and as your agent I am making written offers to close out our timber at forty dollars per acre and am having good hopes that I shall stagger on a man who can see that much in it for him and have the money to close at that price."

Conner's letters show that he regarded James S. Craig's advice to be strong against the sale at the price proposed by Craig & Wolverton. Yet with all this James S. Craig failed in the trust he had undertaken in the concealment of two important facts from Conner: First, on June 17, 1907, James S. Craig, for himself and as agent of Conner, had given to Q. R. Squires an option running till July 2, 1907, to buy the entire timber at $40 an acre; and, second, on the same day he had promised to give Craig &. Wolverton an option on his one-half of the timber in case Squires should not comply. Failure to communicate the latter fact would be of little consequence but for its close connection with the concealment of the first. James S. Craig knew that Conner was in great perplexity as to his course, and as an intelligent business man he could not fail to see what an important factor in Conner's consideration would be the knowledge that Squires, with faith in his ability to comply, had taken an option on the timber at twice the price he then had under consideration. Not only was the importance of this information manifest on its face, but the course of the transaction shows that both the Craigs regarded it of great moment. James S. Craig refused to bind himself to sell to his son while the Squires' option was in force. His correspondence with Squires, his renewal of the option, although his son was complaining of his course towards him, and his testimony in this case indicate that he was hopeful of consummating a sale to Squires. A. L. Craig regarded the Squires' option so important that he wrote his father a letter, bitterly reproaching him for having given it, and in his testimony he says that after hearing of it, though he thought the price so excessive, a sale could not be made under it, and though he continued to write Judge Conner about allowing his firm to make a sale, yet he practically gave the matter up. It is true Squires did not comply, but he testified he was confident of his ability to comply, but for lack of time.

Not only did James S. Craig and A. L. Craig allow Conner to place himself in the most embarrassing position of unwittingly giving an option to Craig & Wolverton while the Squires' option was outstanding, but A. L. Craig considered whether under his option he would not be entitled to the advantage of a sale at the higher price named in the Squires' option if it should be accepted. Under these facts it is not possible to accept the explanation made by James S. Craig that he did not mention the Squires' option because he attached no importance to it, and because he wanted to surprise Conner with good news if Squires complied. Nor is it possible to agree that the statement above quoted from James S. Craig's letter to Conner of June 18, 1907, to the effect that he was making written offers to close out the timber at $40 and that he had good hopes of staggering on a man who would take it at that price, was notice to Conner of the Squires' option. On the contrary this statement could not but lead Conner to the inference that there was no definite negotiation pending at the higher price mentioned, and no definite prospect of sale to a particular individual. It

is most significant that this letter was written the day after the option was given to Squires and had been made known to A. L. Craig. It was carefully prepared by James S. Craig and typewritten by A. L. Craig. The letter is an elaborate and carefully guarded statement of the facts as seen by the writer and of his opinions. Careful perusal of it in view of the surrounding facts, particularly the failure of James S. Craig to mention the Squires' option in his interview with Conner on July 4, 1907, forces the conclusion that information as to the Squires' option was intentionally withheld by James S. Craig, and that A. L. Craig availed himself of the concealment and obtained the second option from Conner overlapping the first in point of time at half the price.

Focusing all the circumstances on this letter and the interview of July 4, 1907, the attitude and motive of James S. Craig is brought into view. He saw his obligation to Conner and was unwilling to sacrifice Conner's interest for the benefit of his son; but he knew that if the Squires' option failed and Conner sold his half interest for $20 an acre, there would be a strong inducement to the purchaser to acquire his own half interest at a greater price. But motive is not of paramount importance. Whatever be the motive, equity will not allow an agent and cotenant to take a greater price for himself to the exclusion of his principal and cotenant, when the principal and cotenant sells at the less price because of the agent's failure to disclose an important fact which it was his duty to disclose. In the leading case of Van Horne v. Fonda, 5 Johns. Ch. 388, Chancellor Kent lays down the rule, which has since been often restated and followed, that the bare relation of cotenants creates "a mutual obligation" to deal "candidly and benevolently" with each other. In addition to this obligation and far beyond it in significance, James S. Craig voluntarily assumed the duties of agent and trustee, promising to keep Conner informed as to all material facts which would affect his interest. The concealment of a material fact which induced Conner to sell at a lower price and contributed to his own sale at a higher price requires a court of equity to hold that, even if Craig & Wolverton had been innocent purchasers, James S. Craig should at least share with his principal and cotenant the benefit which he took. The rule that a trustee cannot be allowed to profit by such concealment is too familiar to require support by citation of authority. It is thus stated in Perry on Trusts, 206:

"All the knowledge of an agent belongs to his principal for whom he acts, and if the agent uses it for his own benefit he will become a trustee for his principal."

[2, 3] 2. The rights of Conner against Craig & Wolverton are dependent on a different principle, for they were mere vendees dealing with Conner at arm's length and assuming no trust relation to him. The general rule is that a vendee is not bound to disclose his knowledge of the property. But since the rule rests on the presumption that the vendor knows his own property, the moment silence passes into suppression the region of bad faith is entered; and a very small act, or very slight circumstances, will convert concealment into fraud. Conlan v. Sullivan, 110 Cal. 624, 42 Pac. 1081; Faxon v. Baldwin,

136 Iowa, 519, 114 N. W. 40. In Turner v. Harvey, Jacob, 187, Lord Eldon, speaking of the general rule that a vendee may remain silent says:

"But a very little is sufficient to affect the application of that principle; if a word, if a single word, be dropped which tends to mislead the vendor, that principle will not be allowed to operate."

Here the conduct of A. L. Craig is fatal to his claim that he merely exercised the right of a vendee to keep silence. He knew that his father, who was Conner's agent, was concealing the important fact of the negotiation with Squires, and availed himself of that concealment to make a bargain with Conner. Where a vendee knows that a vendor is misled by a breach of trust of his agent, he cannot hold his bargain, because by availing himself of the breach of trust he becomes a participant in it. In such case the aid of the court is afforded, not only against the trustee, but against all claiming any benefit from his acts. Perry on Trusts, 172, and cases cited; Bush v. Bush, 1 Strob. Eq. 377; Wooddell v. Bruffy's Heirs, 25 W. Va. 465.

Besides, A. L. Craig actively participated in at least one important act by which Conner was misled. The letter of June 18th from James S. Craig to Conner plainly conveyed to Conner on its face the impression, contrary to the fact, that there was no definite negotiation pending with any particular person for the purchase of the timber; and this communication, bearing that plain implication, was copied and mailed for his father by A. L. Craig. Participation of A. L. Craig in the concealment of James S. Craig precludes Craig & Wolverton from the benefit of their bargain with Conner.

[4] 3. Little need be said on the defense of estoppel. This is not an action for rescission, for rescission would be impossible after the property had passed to Weston Lumber Company, an innocent purchaser; but it is an action to declare a trust in favor of the plaintiff in one-half of the purchase money received from Weston Lumber Company. This being so, it was not inconsistent with the right asserted that the plaintiff should use the money already paid to him. Equity does not require the absurd thing of repayment of money by the plaintiff to be paid to him again with other money claimed by him. Pierce v. Wood, 3 Foster (23 N. H.) 519; Montgomery v. Pickering, 116 Mass. 227; Wallace v. Sisson, 4 Cal. Unrep. 34, 33 Pac. 496.

The charge that James S. Craig was to have a portion of the profit made on Conner's interest is not sustained by the preponderance of the evidence. But the confessed and successful efforts made by the Craigs after the sale to Weston Lumber Company to conceal from Conner the sale at $40 an acre and to make him believe that James S. Craig had not sold his interest strengthen the conviction that they intentionally concealed from him the fact that Squires was negotiating for the timber at $40 an acre.

The result is that Conner's representative must share in the proceeds of the sale to Weston Lumber Company as if he had been named as a party in interest to the sale at $40 an acre. The evidence shows, however, that the sale was a most advantageous one, and Conner's estate will receive great benefit from the sale and the work of Craig &

Wolverton in making it, and that for their work in making the sale 10 per cent. would be reasonable compensation. We think adjustment of the equities requires that Craig & Wolverton be allowed that commission on the one-half of the purchase money received and to be received from the sale to Weston Lumber Company, going to Conner's estate. Levietta B. Conner, administratrix of the Estate of John S. Conner, is entitled to receive one-half of the entire purchase money paid and to be paid by Weston Lumber Company, less the amount received from Craig & Wolverton, and less 10 per cent. commissions allowed to Craig & Wolverton.

Reversed.

## On Petition for Rehearing.

Careful consideration of the petition for rehearing does not disclose any material point which was not carefully considered by the court in reaching its conclusion. It is impossible that the opinion of the court could be construed as holding that the administratrix of John S. Conner is entitled to share in the proceeds of the sale of any property except that which was owned by John S. Conner and James S. Craig as tenants in common. It is true that at the argument mention was made of the insolvency of the Weston Lumber Company, but its agreement with Craig & Wolverton provided for a vendor's lien for the unpaid purchase money, and the court could not assume that the security was inadequate nor could it require that Conner should act upon that assumption. Should the extremely improbable contingency arise that the amount received from Weston Lumber Company for Conner's half interest be less than the amount which Craig & Wolverton agreed to pay Conner, it will be time enough for the defendants to ask for the proper relief. But the court cannot allow such a remote possibility to influence it to deny Conner's estate the right to participate in the advantage of the sale to Weston Lumber Company.

The petition for rehearing is dismissed.